IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **WILLIAM SAKI,** *et al.*,<br>     *Plaintiffs,*<br>v.<br>**CHARLES L. NORMAN,** *et al.*,<br>     *Defendants.* | Case No.: 1:25-cv-01893 |

**WILLIAM SAKI AND CYRUS MAHDAVI'S MOTION FOR
A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs William Saki and Cyrus Mahdavi respectfully move for a temporary restraining order and preliminary injunction (1) barring Defendants from enforcing their rules for vanity license plates; and (2) requiring them to approve their applications for license plates reading "GAY" and "MUSLIM." As laid out below, those rules violate the First and Fourteenth Amendment rights to free speech and equal protection of the laws.

TABLE OF CONTENTS

Summary of Argument ...............................................................................................................3

Issues Presented ........................................................................................................................5

Facts .........................................................................................................................................5

Legal Standard ..........................................................................................................................7

Law & Argument .......................................................................................................................7

I.    Because the BMV's censorship regime violates the First Amendment, Plaintiffs are likely to prevail on the merits. ............................................................................................7

    A.    The BMV's censorship regime violates the First Amendment because it is unconstitutionally vague. .....................................................................................7

    B.    The BMV's censorship regime violates the First Amendment because it is unconstitutionally overbroad. ............................................................................10

    C.    Defendants' censorship regime violates the First Amendment because it fails even the most forgiving analysis for mere "reasonableness." ...........................14

        1.    Defendants' censorship regime is not reasonable in light of the purpose served by the forum because its parameters cannot be objectively applied to achieve reasonable ends. ....................................................................15

        2.    The BMV's censorship regime is not viewpoint-neutral because it discriminates between promoting and disparaging certain topics. .................18

II.   Because the remaining preliminary-injunction factors are *per se* satisfied when a plaintiff is likely to succeed on a First Amendment claim, the Court should grant Plaintiffs injunctive relief. ..........................................................................................................21

Conclusion ...............................................................................................................................23

Certificate of Service ...............................................................................................................23

### SUMMARY OF ARGUMENT

Federal courts in the Sixth Circuit agree that the First Amendment protects vanity license plates. Michigan's ban on vanity license plates "offensive to good taste and decency" was struck down in 2014. *Matwyuk v. Johnson*, 22 F. Supp. 3d 812, 824 (W.D. Mich. 2014) ("[T]he First Amendment applies to messages on personalized license plates."). Kentucky's ban on vanity plates promoting "any specific faith, religion, or anti-religion" was struck down in 2019. *Hart v. Thomas*, 422 F. Supp. 3d 1227, 1233 (E.D. Ky. 2019) ("[V]anity plates are private speech protected by the First Amendment.")

Now it's Ohio's turn. More than 20 years ago, the Ohio Bureau of Motor Vehicles settled another First Amendment lawsuit by agreeing to screen vanity plates using listed criteria—such as "profanity," "sexually explicit," or "advocacy of imminent lawless activity"—but now they are backsliding. They apply no consistent criteria, approving messages one day and then deciding they are forbidden later on. But more offensively, whatever criteria they do have are applied discriminatorily. For instance, Mr. Saki sought to celebrate National Coming Out Day—October 11, 2025—by registering a license plate reading "GAY," "HOMO," or "QUEER," but the BMV refused, despite allowing license plates reading "STR8" and "HETERO." And gay men are not the only target of the BMV's animus. Their own records demonstrate that they likewise limit access to the vanity-plate program based on race (allowing license plates reading "WHT POWR" and "WHT POWA" while rejecting ones reading "BLK POWR" and "BLK POWA"), religion (issuing "BAPTIST," "QUAKER" and "AMISH" while rejecting "JEW" and "MUSLIM"), national origin (issuing "AMERICN," "GERMAN" and "IRISH" while rejecting "RUSSIAN" and "TURKISH.").

But the government must clear high hurdles to impose limits like this on free speech:

- Speech restrictions must not be vague. A law may be unconstitutionally vague because ordinary people cannot understand what it prohibits, or because its standards are so loose as to authorize or encourage arbitrary and discriminatory enforcement. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). As laid out on page 7, the BMV's censorship regime fails on both accounts, as different employees enforce different sets of rules, leading to inconsistent results and encouraging discriminatory enforcement.

- Speech restrictions must not be overbroad. A law may be overbroad if the potential for its unconstitutional applications is substantial in comparison to its plainly legitimate applications. *Morales* at 52. As laid out on page 10, the BMV's censorship regime is overbroad because it permits state officials to invent a justification for prohibiting literally any message they dislike.

- Speech restrictions must be reasonable. Reasonableness is not to be assessed "in the abstract," but instead by asking whether, given the forum's purpose, the state is using "reasonable means" to "pursue reasonable ends." *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transportation*, 978 F.3d 481, 494 (6th Cir. 2020). As laid out on page 15, the BMV's censorship regime is not reasonable because it undermines, rather than advances, the purpose of the vanity-plate program, which was created to generate revenue for roadside parks.

- Speech restrictions must be enforced without respect to the speaker's viewpoint. "The government may reserve nonpublic forums for speech on certain subjects while banning speech on other subjects. ... But the government may not go further by prohibiting specific viewpoints on the topics that it allows." *Am. Freedom Def. Initiative* at 498. As laid out on page 18, the BMV's censorship regime is not viewpoint neutral, as it permits preferred races, ethnicities, sexual orientations, gender identities, and religions to identify themselves on vanity plates while forbidding disfavored races, ethnicities, sexual orientations, gender identities, and religions from doing the same.

As laid out below, the BMV's censorship regime runs afoul of virtually every First Amendment rule it encounters, so the Court should hold that it is unconstitutional, issue a temporary restraining order and preliminary injunction barring the BMV from enforcing it, and order it to approve Plaintiffs' applications.

## ISSUES PRESENTED

1.  A rule is unconstitutionally vague if ordinary people cannot understand what it prohibits. The BMV evaluates vanity plates based on individual censors' subjective assessments of how unidentified third parties will perceive the plate. Can ordinary people predict what meaning a bureaucrat will predict that a third party will assign to their license plates?

2.  A rule is unconstitutionally overbroad if its potentially impermissible applications are substantial in relation to its plainly permissible applications. The BMV rejects messages on vanity license plates if they "can be perceived" as a profane or sexual or scatological word (or phrase, or abbreviation of a phrase), in any language, when read forward or backward. Are the potentially impermissible applications of such a rule substantial in comparison to its plainly permissible applications?

3.  In a nonpublic forum, speech restrictions must be reasonable means of achieving reasonable ends, given the forum's purpose. The BMV created the vanity-plate forum to generate revenue to fund roadside parks, but it rejects application fees from people with messages that may be perceived as profane. Is refusing money from people who say they are "GAY" or "MUSLIM" a reasonable way to generate revenue for roadside parks?

4.  In a nonpublic forum, speech restrictions may not discriminate on the basis of a speaker's viewpoint. The BMV allows drivers to use vanity plates to communicate that they are "WHITE," "GERMAN," "HETERO," or "BAPTIST," but not that they are "NEGRO," "RUSSIAN," "GAY," or "MUSLIM." May the BMV create different rules for different races, nationalities, sexual orientations, and religions?

## FACTS

In 2001, the Ohio Bureau of Motor Vehicles settled a First Amendment lawsuit alleging that it gave its censors "unbridled discretion" to reject applications for vanity license plates with an agreement to clarify its standards for approving or rejecting messages on vanity license plates.[1] The standards it adopted as part of that settlement permitted it to reject messages only for three reasons.[2] A message could be rejected if it "Contains words, combinations and/or phrases (in any language and when read either frontward or backward) that":

1.  "are profane (that is, swearwords or expletives), obscene, sexually explicit, or scatological."

---

[1] *Zucco v. Caltrider*, No. 2:01-cv-01270 (S.D. Ohio).
[2] ECF #2-56, BMV_000114.

2. "are so offensive that they could reasonably be expected to provoke a violent response from viewers without additional comment."

3. "advocate immediate lawlessness or advocate lawless activities."

But those criteria have grown more and more relaxed over time. By 2019, the BMV was rejecting not just plates that were actually obscene, but plates that "can be interpreted as obscene." And now, the BMV has returned to its original, wholly subjective test, rejecting countless messages based on "the potential perception of inappropriateness."[3]

In apparent reliance on this standardless evaluation—or perhaps based on homophobic and Islamophobic animus—the BMV is now refusing to issue vanity plates to Plaintiffs. Mr. Saki sought to celebrate National Coming Out Day by registering a vanity license plate reading "GAY" through the Ohio Bureau of Motor Vehicles website. But the BMV would not allow it, deeming the communication of Mr. Saki's sexual orientation to be "Inappropriate / Invalid."[4] Although it would have permitted him to register a license plate that said "HETERO," it has programmed its website to automatically reject anyone who attempts to register a license plate reading "GAY."[5] It likewises forbid applications for plates reading "GAY 1," "HOMO," "QUEER," and "FAG."[6]

Mr. Mahdavi received the same treatment. In advance of Eid Milad un Nabi, an Islamic holiday celebrating Muhammad's birthday, Mr. Mahdavi sought to register a vanity license plate reading "MUSLIM." But again, the BMV had programmed its system to reject any attempt to register that message, deeming it "Inappropriate / Invalid."[7]

---

[3] Declaration of Jeffrey Wonser, ¶ 4, ECF #2-51.
[4] Declaration of William Saki, ¶¶ 2–4, ECF #2-63.
[5] ECF# 2-61.
[6] ECF# 2-61.
[7] Declaration of Cyrus Mahdavi, ¶¶ 2–3, ECF #2-64.

Plaintiffs therefore brought this action, alleging that the BMV's censorship regime is void for vagueness, overbroad, and unconstitutional as applied to their messages.

### LEGAL STANDARD

A court considering a preliminary injunction must consider and balance "(1) the plaintiff's likelihood of success on the merits, (2) whether the plaintiffs could suffer irreparable harm without the injunction, (3) whether granting the injunction will cause substantial harm to others, and (4) the impact of the injunction on the public interest." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996).

### LAW & ARGUMENT

I.   **Because the BMV's censorship regime violates the First Amendment, Plaintiffs are likely to prevail on the merits.**

   A.   **The BMV's censorship regime violates the First Amendment because it is unconstitutionally vague.**

Vagueness may invalidate a law for either of two independent reasons: "First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Morales* at 56.

For instance, in *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 360 (6th Cir. 1998), a union challenged a transit agency's rule against "controversial" advertisements on its buses. The district court held that the rule was not void for vagueness; because it was designed to protect agency revenue by rejecting ads that might discourage ridership and thus reduce revenue, it clearly identified what messages it prohibited by measuring their potential effect on the agency's commercial interests. But the Sixth Circuit rejected that analysis, holding that the rule was unconstitutionally vague because it

permitted the agency to reject ads simply because they "may" affect ridership rather than requiring "demonstrated causality" before rejecting a message:

> In the absence of … a demonstrable causality between an advertisement's controversial nature and SORTA's interests, the Policy invites "subjective or discriminatory enforcement" by permitting the decisionmaker to speculate as to the potential impact of the controversial advertisement on SORTA's interests.

And because the agency also had a rule requiring ads to be "aesthetically pleasing," its policies also failed the other prong of the vagueness analysis, as such a subjective rule "invites arbitrary or discriminatory enforcement":

> Since it is not susceptible to objective definition, the "aesthetically pleasing" requirement grants SORTA officials the power to deny a proposed ad that offends the officials' subjective beliefs and values under the guise that the ad is aesthetically displeasing."

Here, the BMV's censorship regime fails each of these tests. **First,** a person of ordinary intelligence has no way of knowing what its rules permit and prohibit, because there is no way for them to know which of censors will review an application, how that censor will assess the likelihood that third parties will perceive their message as "inappropriate," or how great the potential of such a perception must be to trigger a rejection. Indeed, no one can know what is and is not permitted, because BMV decisions are not based on a message's actual meaning or any *demonstrated* effect it might have, but rather on how unrelated third parties might react to it, asking not what the message says but whether it is subject to a "potential perception of inappropriateness."

**Second,** The BMV's rules authorize and encourage arbitrary enforcement, forbidding many messages for no apparent reason while permitting materially indistinguishable messages.

Lists of issued and rejected plates—produced in discovery in a separate case—show how just how arbitrary the BMV's censor are:[8]

1. "ABC1" is prohibited, but "ABC5" is permitted.
2. "BUT" is prohibited, but "BUTT" is permitted.
3. "CUBSROK" is prohibited, but "CUBSW1N" is permitted.
4. "DUMBAZZ" is prohibited, but "AZZ" is permitted.
5. "E591" is prohibited, but "E621" is permitted.
6. "F0RSALE" is prohibited, but "4ORSALE" is permitted.
7. "GARG0YL" is prohibited, but "GARGOYL" is permitted.
8. "HATER" is prohibited, but "HATE" is permitted.
9. "IDIOT" is prohibited, but "3 IDIOTS" is permitted.
10. "JFK 0" is prohibited, but "JFK 5" is permitted.
11. "KNIFE" is prohibited, but "KNIVES" is permitted.
12. "LDYBUGZ" is prohibited, but "LDYBUGY" is permitted.
13. "MAGGIE 0" is prohibited, but "MAGGIE 3" is permitted.
14. "NASTY22" is prohibited, but "NASTY21" is permitted.
15. "O3HOG" is prohibited, but "O4HOG" is permitted.
16. "PIGMAN" is prohibited, but "PIGDAD" is permitted.
17. "QQQQ" is prohibited, but "QQQQQ" is permitted.
18. "REDRUM8" is prohibited, but "REDRUM6" is permitted.
19. "SSSSHHH" is prohibited, but "SSHHHHH" is permitted.
20. "TOPGUNS" is prohibited, but "TOPGUN" is permitted.
21. "UFOXXX" is prohibited, but "UFOXX" is permitted.
22. "VAMP 1" is prohibited, but "VAMP 5" is permitted.
23. "WTCH" is prohibited, but "WKD WTCH" is permitted.
24. "XR" is prohibited, but "XL" is permitted.
25. "YL00" is prohibited, but "YL5112" is permitted.
26. "ZOMBIEX" is prohibited, but "ZOMBEEX" is permitted.

---

[8] *Compare* ECF #2-59 *with* ECF #2-61.

**Third,** the BMV's rules authorize and encourage discriminatory enforcement. As laid out in more detail in Section I.C.2, they result in preferential treatment for white drivers over black, straight drivers over gay, and Christian drivers over Jewish and Muslim.

This kind of unpredictable and discriminatory enforcement is exactly what the void-for-vagueness doctrine was meant to prohibit. Unshackled from any meaningful guidance, censors are free to impose whatever rules they want, treating virtually identical messages differently and choking off the speech of disfavored groups. The BMV censorship regime is therefore void for vagueness, and the Court should enter a preliminary injunction barring its enforcement.

### B.    The BMV's censorship regime violates the First Amendment because it is unconstitutionally overbroad.

"[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.'" *Morales* at 52. An overbreadth analysis moves in two steps: "The first step … is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). The second step asks whether the law prohibits "a substantial amount of protected expressive activity." *Williams* at 297, when compared to the law's "plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010).

The Sixth Circuit's decision in *UFCW* addressed the overbreadth issue, as well, holding that a ban on "controversial" ads was an overbroad solution to the transit agency's goal of attracting and maintaining ridership. Although messages could be "controversial" because of the objective characteristics of the form in which they were presented, the agency's regulations permitted it to reject ads that were controversial "simply because the listener disagrees with the speaker's message":

A viewpoint challenging the beliefs of a significant segment of the public, however, frequently will generate discord. Thus, an ad's controversy often is inseparable from the viewpoint it conveys. … We therefore can conceive of numerous cases where under SORTA's advertising policy "it is the treatment of a subject, not the subject itself, that is disfavored."

On a facial challenge for overbreadth, then, a court's analysis should turn "not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the [law] preventing him from doing so." *Forsyth Cnty.,* 505 U.S. at 133 n. 10 (1992). So even if the BMV had not been abusing its discretion, that would not save its censorship regime from an overbreadth challenge, where the question is instead whether anything *prevents* it from doing so. But on these facts, it couldn't survive either analysis, as it rejects messages not because they are objectively problematic in any way, but merely because one of their censors subjectively believes that someone, somewhere, someday might perceive the message as having a forbidden meaning.[9]

That has naturally led to the problems that the overbreadth doctrine was meant to prevent. As laid out above, BMV censors are construing its criteria to permit messages carrying certain viewpoints while prohibiting messages carrying opposing viewpoints. And they are also prohibiting all manner of perfectly protected messages based on arbitrary determinations that they are insufficiently unrelated to a topic the BMV has designated as "inappropriate."

Even if the Court were to assume that Defendants could permissibly define "inappropriate" to mean "profane" or "sexually explicit," the BMV has used the "potential perception of inappropriateness" to contort such criteria far beyond meaning. For instance:

- It rejected a license plate reading "FUCK HER."[10]

---

[9] Wonser Decl., ¶¶ 4–5.
[10] ECF #2-45, WONSER_001782.

- But it goes a step further and rejects messages that can reasonably be read to include abbreviations for "fuck," such as "FUSARAH," though that message does not actually contain any profane words.[11]

- Then it goes a step further and rejects strings of characters that have no actual meaning but could reasonably be read to sound profane, such as "PHUQQUE."[12]

- Then it goes a step further and rejects strings of characters that have no actual meaning and *cannot* reasonably be read as profane, such as:

    o "DRIVE TF," which they interpreted as "drive the fuck."[13]

    o "FURB," which they interpreted as "fuck you right back."[14]

    o "TNSAF," which they interpreted as "True North Strong As Fuck."[15]

    o "PSYSHIB," which they interpreted as "pussy fucking."[16]

    o "EFORTY6," which they interpreted as "Fuck 46."[17]

The same is true when looking at messages that may have been rejected as "sexually explicit." For instance:

- The BMV sometimes applies the rule to messages that are actually sexually explicit, such as "ANAL SEX."[18]

- But it goes a step further and applies the rule to words that are at best sexually euphemistic rather than explicit, such as "SHAG SW," which it rejected because it could mean "shag wagon."[19]

- Then it goes a step further and applies the rule to messages that can plausibly be read as referring to body parts that are critical to sexual function but are most frequently used for nonsexual purposes, such as "CML TOE"[20] and "T1NYPP."[21]

---

[11] ECF #2-6, WONSER_000054.

[12] ECF #2-29, WONSER_000670.

[13] ECF #2-8, WONSER_000082–83.

[14] ECF #2-13, WONSER_000139–44.

[15] ECF #2-9, WONSER_000310.

[16] ECF #2-22, WONSER_000237.

[17] ECF #2-37, WONSER_001298.

[18] ECF #2-5, WONSER_000466.

[19] ECF #2-16, WONSER_000175.

[20] ECF #2-36, WONSER_001490.

[21] ECF #2-40, WONSER_001605.

- Then it goes a step further and applies the rule to strings of characters that can plausibly be read as referring to body parts that are *not* critical to sexual function but many people find erotic, such as "BEWB"[22] and "TITPINK."[23]

- Then it goes a step further and applies the rule to strings of characters that can plausibly be read as acknowledging the mere state of nudity, such as "NOODS."[24]

- Then it goes a step further and applies the rule to references to romantic literary genres that may or may not have any sex or nudity at all, rejecting "YAOIPLZ."[25]

- Then it goes a step further to apply the rule to words that are obvious references to nonsexual subjects and assign them implausible sexual interpretations. For instance, when a driver asked to promote "prostate awareness" with an "End Prostate Cancer" license plate reading "GETPKD," a BMV censor rejected it as sexually explicit.[26]

At this level of abstraction, the BMV's criteria permit it—or any member of the public—to reject virtually any message. If it can reject "TNSAF" merely because it has at least one letter that it can isolate from its context and arbitrarily assign a forbidden meaning, it can reject literally any message at all, no matter how plainly protected it is by the First Amendment. If Plaintiffs wants to announce that they are from "OHIO," the BMV can reject that message as advocating lawlessness because it *could* be perceived as meaning "obstruct honest investigating officers." If they want to tell people they are "PROLIFE," the BMV can reject that message as profane because it *could* be perceived as meaning "Police really oughtta live in fucking exile." If they want to encourage fellow drivers to "VOTE," the BMV can reject that message as sexually explicit because it *could* be perceived as meaning "vagina on the erection."

The BMV may argue that that these possibilities are implausible or should be ignored because it has actually issued each of those plates, but on an overbreadth analysis, that argument

---

[22] ECF #2-31, WONSER_000898.
[23] ECF #2-20, WONSER_000415.
[24] ECF #2-14, WONSER_000353.
[25] ECF #2-1, WONSER_000453.
[26] ECF #2-17, WONSER_000380.

is irrelevant. The question is not whether the BMV *has* adopted overly broad interpretations of its authority to squelch speech, but rather whether there is anything stopping it from doing so. *Forsyth Cnty.,* 505 U.S. at 133 n. 10 (1992). Under the current censorship regime, there is not; should the BMV choose to reinterpret *any* issued plate as having a forbidden meaning, there is nothing stopping it from recalling the plate.

By construing its criteria to forbid not only messages that are objectively profane or sexually explicit, but also messages that "can be interpreted" as "inappropriate," the BMV has granted itself unlimited discretion to ban whatever messages it wants. Because those criteria leave room for vast amounts of impermissible censorship—far beyond any "plainly legitimate sweep" the BMV might identify—its censorship regime is unconstitutionally overbroad.

### C.     Defendants' censorship regime violates the First Amendment because it fails even the most forgiving analysis for mere "reasonableness."

Plaintiffs maintains that the vanity-plate program is a designated public forum, but regardless of what kind of forum it is, the BMV must be able to establish that its speech restrictions, at a minimum, "are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)

For instance, in *Am. Freedom Def. Initiative*, a religious group encouraging Muslims to leave Islam challenged a regulation banning "political" advertisements and ads that "scorn or ridicule any person or group of persons" in Detroit's public-transit system. Despite the plaintiff's contention that the advertising program created a designated public forum, the district court granted summary judgment for the transit system, holding that it had instead opened a nonpublic forum subject to far less scrutiny. But the Sixth Circuit reversed, holding that the forum question was irrelevant because in either case, the transit system's rules needed to be at least "reasonable

and viewpoint neutral" but were in fact neither reasonable (because they "cannot be objectively applied") nor viewpoint neutral (because the agency offered different benefits for "those that promote [a] group and those that disparage it.").

As laid out below, the same is true here:

> **1. Defendants' censorship regime is not reasonable in light of the purpose served by the forum because its parameters cannot be objectively applied to achieve reasonable ends.**

In a nonpublic forum, content-based speech restrictions must be "reasonable," i.e., "the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 16 (2018).

In *AFDI*, the Sixth Circuit clarified that reasonableness is not to be assessed "in the abstract," but instead by considering the purpose of the forum and asking whether the state is using "reasonable means" to "pursue reasonable ends." There, the court held that even if the ban on "political" advertisements was adopted to achieve a reasonable goal, it was not a reasonable policy because transit officials couldn't articulate any "objective, workable standards" for determining which ads were "political." Defining the term broadly to include anything "dealing with the structure or affairs of government" would prohibit get-out-the-vote ads, which the agency allowed; meanwhile, defining it narrowly to refer only to things "characteristic of political parties or politicians" likewise yielded inconsistent results. And in the absence of any guidance on what definition to use, agency employees couldn't even agree among themselves what ads were and were not political.

The same problems are present here. Ohio began its vanity license plate program to fund roadside parks. Plaintiffs concede this is a reasonable end, but the BMV's heavy-handed censorship regime is not a reasonable means of promoting it. A license plate that says

"MUSLIM" generates the same amount of revenue for roadside parks as a license plate that says "BAPTIST," but rejecting it generates *no* revenue for roadside parks.

Nor can there be any "reasoned application," *Mansky* at 23, of a rule prohibiting messages that could be "perceived" or "interpreted" as "inappropriate," as those words could be defined expansively or narrowly or anywhere in between. Appropriate for what occasion? As perceived by whom? Using what interpretive principles? The BMV never says; it leaves those questions to the discretion of each individual censor. Just as in *AFDI*, this naturally leads to inconsistent results:

- The BMV rejected "F46 LGB" because "F46" and "LGB" could each be perceived as meaning "Fuck Joe Biden," but it has nonetheless issued a license plate that reads "F46" and another license plate that reads "LGB."

- The BMV rejected "YAOIPLZ" as inappropriate because it referred to a genre of Japanese literature,[27] but it approved "MRS YAOI."[28]

- The BMV rejected "AXEHOLE" as inappropriate, but it approved "AXE HOLE."[29]

- The BMV rejected "REDRUM8" for referring to murder but approved "REDRUM6."[30]

- The BMV rejected "SKEET," but it approved "JIZZ," despite interpreting both as referring to semen.[31]

- The BMV rejected "XXX JEEP" because "XXX could be perceived as relating to or denoting pornography,"[32] but it approved "XXXTRA," despite also flagging it as "Sexually Explicit."[33]

- The BMV approved "AMFYOYO" for one driver in 2006 and for another driver in 2010, but it rejected it for another driver in 2021.[34]

---

[27] ECF #2-1, WONSER_000453.
[28] ECF #2-59.
[29] ECF #2-59.
[30] ECF #2-16, ECF #2-59.
[31] ECF #2-28, WONSER_000819.
[32] ECF #2-15, WONSER_000360.
[33] ECF #2-21, WONSER_000231.
[34] ECF #2-11, WONSER_000103.

So even when BMV censors are allowed to use the strictest criteria available, and even when they are permitted to interpret those criteria as broadly as they want, messages that nonetheless survive review by every single BMV censor remain subject to a heckler's veto:

- The BMV approved "IAMHBIC" but then recalled it because a driver believed the B stood for "beotch."[35]

- The BMV approved "IDFW GAS" but then recalled it because a driver believed the F stood for "fuck."[36]

- The BMV approved "THICCUM" but then recalled it because a driver believed it meant "Thick ejaculate."[37]

But the heckler's-veto protocol is likewise inhospitable to any reasoned application, as there is no apparent rule saying when a public complaint is sufficient to trigger a recall. The evidence demonstrates that the BMV has received numerous other complaints but refused to recall the allegedly "inappropriate" plates:

- The BMV received multiple complaints about "KNATZ1," which drivers believed was "derogatory toward Jewish people," but it did not recall the plate.[38]

- The BMV received a complaint that a driver perceived "DMNKDS" as meaning "damn kids" but did not recall the plate,[39] although they denied "DMNBOOG" because they perceived it as meaning "damn boog."[40]

- The BMV received a complaint that a driver perceived "LETZGOB" as meaning "fuck Joe Biden" but did not recall the plate,[41] although they rejected "NEDIBJF" based on the same perception.[42]

- The BMV received a complaint about "TXTNDRV" but did not recall the plate.[43]

---

[35] ECF #2-10, WONSER_000314.
[36] ECF #2-24, WONSER_000632.
[37] ECF #2-27, WONSER_000968.
[38] ECF #2-19, WONSER_000211.
[39] ECF #2-33, WONSER_001119.
[40] ECF #2-35, WONSER_001474.
[41] ECF #2-38, WONSER_001376.
[42] ECF #2-25, WONSER_000747.
[43] ECF #2-4, WONSER_000324.

- The BMV received a complaint about "JAN 6 DC" but did not recall the plate. [44]
- The BMV received a complaint that a driver perceived "GO KYS" as meaning "go kill yourself" but did not recall the plate.[45]

These cases show that the BMV is not using reasonable means to achieve reasonable ends, as it repeatedly takes positions that are diametrically opposed to each other in cases that are materially identical in terms of generating revenue for roadside parks. On the contrary, it interprets kits rules to *undermine* its own objective by rejecting revenue from drivers who want to disseminate messages that would have no deleterious impact on funding for roadside parks. Because it is not governed by any objective, workable standards that would advance its goal of funding roadside parks, the BMV's censorship regime is not a reasonable restriction on speech.

### 2.     The BMV's censorship regime is not viewpoint-neutral because it discriminates between promoting and disparaging certain topics.

"The government may reserve nonpublic forums for speech on certain subjects while banning speech on other subjects. ... But the government may not go further by prohibiting specific viewpoints on the topics that it allows." *Am. Freedom Def. Initiative* at 498.

In *AFDI*, the Sixth Circuit recognized that the starting point for analyzing viewpoint discrimination comes from the Supreme Court's recent decision in *Matal v. Tam*, 582 U.S. 218, 243 (2017). There, an Asian rock singer sought trademark protection for "The Slants," the name of his band, but the Patent and Trademark Office refused to register his mark, telling him that he was being too disparaging to Asian-Americans. The Federal Circuit affirmed, holding that because the government was merely refusing to register a mark, rather than prohibiting the singer from using it, there were no First Amendment issues. But the Supreme Court reversed, holding

---

[44] ECF #2-32, WONSER_000917.
[45] ECF #2-23, WONSER_001035.

that having opened up the trademark-registration program to the public, the government could not lock people out just because they have something negative to say:

> To be sure, the clause evenhandedly prohibits disparagement of all groups. It applies equally to marks that damn Democrats and Republicans, capitalists and socialists, and those arrayed on both sides of every possible issue. It denies registration to any mark that is offensive to a substantial percentage of the members of any group. But in the sense relevant here, that is viewpoint discrimination: Giving offense is a viewpoint.

Here, Plaintiffs are likely to succeed on the merits because the record demonstrates that the BMV is prohibiting messages that communicate specific viewpoints, even on topics it permits to be discussed on vanity plates:

- **Politics:** The BMV rejected "FUDEM" but issued "FUGOP."[46]
- **Race:** The BMV will not allow "BLK POWR," "BLK POWA," or "BLK PWR 1," but it will allow "WHT POWR," "WHT POWA," or "WHT PWR 1."[47]
- **Support for the police:** The BMV refuses to issue "IH8COPS" but permits "LUVCOPS."[48]
- **Gender identity:** The BMV refuses to issue "QUEER" but permits "CIS."[49]
- **Sexual orientation:**
  - The BMV refuses to issue "GAY" or "LESBIAN," but permits "NO GAYS," "IM STR8" and "STR8."[50]
  - The BMV refuses to issue "HOMO" but permits "HETERO" and "NO HOMO."[51]
  - The BMV likewise rejects "WLW," a common acronym referring to "women loving women," though it has issued both "MLW" and "WLM."[52]
- **Ancestry:**

---

[46] *Compare* ECF #2-59 *with* ECF #2-61.
[47] Saki Decl., ¶¶ 18–19.
[48] *Compare* ECF #2-59 *with* ECF #2-61.
[49] Wonser Decl., ¶ 12f.
[50] Wonser Decl., ¶ 12d.
[51] Wonser Decl., ¶ 12d.
[52] Wonser Decl., ¶ 12e.

- o The BMV will not permit the message "POLACK."[53] But it will permit neutral references to Polish ancestry, such as "POLISH 3," "POLSK4" and "POLISH 5."[54]

- o The BMV will likewise permit "MEXICAN," "ASIAN," or "AMERICN," but it refuses to issue "BEANER," "SLANT I" or "GRINGO."[55]

- **Religion:** The BMV has no issue with license plates reading "ATHEIST," "BAPTIST," "TAOIST," "SIKH," "BAHAI," or "HINDU," but it refuses to issue license plates reading "JEW" or "MUSLIM."[56]

- **Sports rivalries:**

- o The BMV rejected "TIGSUX" because it disparaged the Massillon High School Tigers, but it will permit drivers to say "GO TIGER."[57]

- o The BMV forbids "BNGLSUK" but permits "LVBNGLS."[58]

- o The BMV forbids "BUCSSUK," but permits "GOBUCZ."[59]

- **Alcohol preferences:**

- o The BMV forbids "COORSLT," but permits "BUDLGHT."[60]

- o The BMV forbids "ZINFNDL," but permits "MERLOT."[61]

- o The BMV forbids "CRWN RYL," but permits "JCK DNLS."[62]

These are exactly the distinctions that the viewpoint-neutrality requirement is meant to address. While citizens are debating an issue, the government may not constrain them by imposing a regulatory scheme that "dampens the vigor and limits the variety of public debate." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). That rule holds true, regardless of the

---

[53] ECF #2-61.

[54] ECF #2-46, WONSER_002883, WONSER_003072.

[55] Wonser Decl., ¶ 12b–c.

[56] Wonser Decl., ¶ 12g.

[57] ECF #2-9, WONSER_000312.

[58] *Compare* ECF #2-59 *with* ECF #2-61.

[59] *Compare* ECF #2-59 *with* ECF #2-61.

[60] *Compare* ECF #2-59 *with* ECF #2-61.

[61] *Compare* ECF #2-59 *with* ECF #2-61.

[62] *Compare* ECF #2-59 *with* ECF #2-61.

topic. *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831 (1995) ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint.").

Because it discriminates based on what position drivers wish to communicate on various subjects, the BMV's censorship regime is not viewpoint neutral. And because it is likewise not reasonable, it violates the First Amendment, regardless of whether the vanity-plate program is a nonpublic forum or a designated public forum.

## II. Because the remaining preliminary-injunction factors are *per se* satisfied when a plaintiff is likely to succeed on a First Amendment claim, the Court should grant Plaintiffs injunctive relief.

Although courts typically must evaluate and balance the four familiar factors before granting an injunction, the analysis is far simpler in First Amendment cases such as this one. Given the unique dangers posed by government restrictions on speech and the law's heavy presumptions against them, the four preliminary-injunction factors "collapse" into the question of success on the merits, asking "whether restrictions on First Amendment rights are justified to protect competing constitutional rights." *Cty. Sec. Agency v. Ohio Dep't of Commerce*, 296 F.3d 477, 485 (6th Cir. 2002).

For instance, in *Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012), a pair of evangelists sought an injunction against regulations prohibiting "soliciting of causes" during the Fairborn Sweet Corn Festival. The district court refused to grant the injunction, holding that the rule was a reasonable restriction on the time, place, and manner of speech. But the Sixth Circuit reversed, holding that even if that were true, the plaintiffs were likely to succeed on the merits

because the City's restrictions were not narrowly tailored to its interest in promoting smooth

pedestrian traffic. And because the plaintiffs prevailed on the First Amendment question, the

Sixth Circuit held they must prevail, as a matter of law, on all the other preliminary-injunction

questions, as well:

> [T]he issues of the public interest and harm to the respective parties largely
> depend on the constitutionality of the solicitation policy. The loss
> of First Amendment freedoms, for even minimal periods of time, unquestionably
> constitutes irreparable injury. Moreover, if the plaintiff shows a substantial
> likelihood that the challenged law is unconstitutional, no substantial harm to
> others can be said to inhere its enjoinment. Finally, it is always in the public
> interest to prevent violation of a party's constitutional rights.

As laid out above, the record demonstrates that Plaintiffs are likely to succeed on the

merits, as the BMV's censorship regime runs afoul of the First Amendment, no matter how it

runs the analysis. Plaintiffs therefore satisfy all the other requirements for injunctive relief under

*Cty. Sec. Agency*. The facts specific to this case vindicate that "collapsed" approach:

- Granting the injunction will prevent irreparable harm because Plaintiffs are
  irreparably injured every day that they are not able to disseminate their messages to
  others who might see them on the road, in parking lots, or in front of their homes.
  *Thompson v. DeWine*, No. 2:20-CV-2129, 2020 WL 2614447, at *3 (S.D. Ohio May
  22, 2020) ("This Court found Plaintiffs were likely to succeed on the merits of their
  First Amendment claims, and every day that passes … is another day they are
  harmed.").

- Granting the injunction will not cause substantial harm to others, as being exposed to
  free speech—even if that speech is "profane"—is not a cognizable injury unless
  "substantial privacy interests are being invaded in an essentially intolerable manner."
  *Cohen v. California*, 403 U.S. 15, 21 (1971).

- Granting the injunction is in the public interest, as "it is always in the public interest
  to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v.
  Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994), "particularly
  First Amendment rights," *Nixon v. N. Local Sch. Dist. Bd. of Educ.*, 383 F. Supp. 2d
  965, 975 (S.D. Ohio 2005).

## CONCLUSION

The BMV has empowered its censors with unjustifiably vague and overly broad authority to silence messages based on their guesses of the public's subjective perceptions of those messages. Given a free hand, those censors are naturally silencing messages based not on whether doing so will reasonably advance the state's objective of funding roadside parks, but rather on whether those messages align with the censors' preferred viewpoints. Doing so has injured Plaintiffs by limiting their ability to disseminate counterspeech in opposition to the speech the BMV has approved. Because they continue to suffer an injury every day that the BMV perpetuates this scheme, the Court should hold that its censorship regime violates the First Amendment, enter a temporary restraining order and a preliminary injunction barring it from enforcing those rules, and require it to approve Plaintiffs' applications.

Respectfully submitted,

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
Speech Law, LLC
4403 Saint Clair Ave, Suite 400
Cleveland, OH 44103-1125
216-912-2195 Phone/Fax
brian.bardwell@speech.law
*Attorney for Plaintiffs William Saki and Cyrus Mahdavi*

## CERTIFICATE OF SERVICE

I certify that on September 9, 2025, this document was served on opposing counsel as provided by Fed. R. Civ. P. 5(b)(1).

*/s/Brian D. Bardwell*
Brian D. Bardwell (0098423)
*Attorney for Plaintiffs William Saki and Cyrus Mahdavi*